# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN MCCRANER, SHARON STIANSEN, JANET POLLARD, MICHAEL DARLINGTON, SUSAN R. LANDREAU, JOHN N. TUFFIELD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO & COMPANY, a corporation, WELLS FARGO BANK, N.A., a national banking association,<br><br>Defendants. | CASE NO. 21cv1246-LAB-LL<br><br>**ORDER:**<br><br>1) **GRANTING MOTION TO DISMISS [Dkt. 12]; and**<br><br>2) **DENYING MOTION TO STRIKE AS MOOT [Dkt. 13]** |

Phillip Peikos, David Barnett, Brian Phillips, Richard Fowler, Ryan Fowler, and Nathan Martinez (collectively, the "Principals") operated three separate online subscription scams through their companies Apex Capital Group, LLC ("Apex"), controlled by Peikos and Barnett, Triangle Media Corporation ("Triangle"), controlled by Phillips, and Tarr Inc. ("Tarr," and collectively with Apex and Triangle, the "Enterprises"), controlled by the Fowlers and Martinez. Each of the Enterprises relied on banking services from defendants Wells Fargo & Company and Wells Fargo Bank, N.A. (together,

"Wells Fargo" or the "Bank") to effect their fraudulent schemes.

The Enterprises allegedly defrauded plaintiffs John McCraner, Sharon Stiansen, Janet Pollard, Michael Darlington, Susan R. Landreau, and John N. Tuffield (collectively, "Plaintiffs"). Plaintiffs filed this putative class action against Wells Fargo asserting four claims: aiding and abetting fraud; conspiracy to commit fraud; violation of Cal. Penal Code § 496; and violation of Cal. Bus. & Prof. Code § 17200. Wells Fargo moves to dismiss each claim.

Each of Plaintiffs' claims requires that they allege facts sufficient to support the inference that Wells Fargo had actual knowledge of the Enterprises' fraud against the Plaintiffs. Because Plaintiffs don't meet this requirement, Wells Fargo's Motion to Dismiss is **GRANTED**, and each claim is **DISMISSED WITHOUT PREJUDICE**. And because Wells Fargo's separate Motion to Strike is directed to allegations in the now-dismissed complaint, that Motion is **DENIED AS MOOT**.

## BACKGROUND

Wells Fargo provided banking services to the Enterprises between 2009 and 2018 (the "Relevant Period").[1] (Dkt. 1, "Compl.," ¶¶ 8, 153, 165, 170, 201). Each set of principals operated "free trial" scams online through their respective Enterprises, promising customers risk-free trials but signing them up for expensive subscriptions that would automatically charge their accounts at regular intervals unless affirmatively cancelled. (*Id.* ¶ 2). To run these businesses, the Enterprises needed access to merchant processing services that allowed them to charge customers' credit cards. But the nature of their fraudulent schemes made continued access difficult: customers challenged the Enterprises' charges at rates that would make merchant processors

---

[1] For the purposes of a motion to dismiss for failure to state a claim, the Court accepts the well-pleaded allegations of the Complaint as true. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).

unwilling to work with them. (*Id.* ¶¶ 69–72).

The Enterprises started shell companies for the purpose of setting up accounts to route the Enterprises' transactions through without having the Enterprises as a whole cut off from merchant processing services, a scheme known as "credit card laundering."[2] (*See, e.g., id.* ¶¶71–73). It wouldn't be enough to simply start new companies—the principals needed to hide their personal involvement with those companies to ensure that they would be able to get merchant processing services. Triangle and Apex accomplished this by recruiting straw owners. (*Id.* ¶¶ 77, 84, 106, 121–22, 157). Those Enterprises' principals made clear to the Bank that they should retain control over the accounts, and Wells Fargo complied. (*Id.* ¶¶ 125, 159).

Over the course of Wells Fargo's relationship with the Enterprises, the Bank received numerous signals that the Enterprises were engaging in misconduct. Wells Fargo's monthly account statements for the Enterprises' accounts reflected very high chargeback rates relative to industry standards. (*Id.* ¶ 98, 111–13, 192, 228). When Apex accounts lost merchant processing services due to high chargeback rates, Apex closed them and opened new ones through new shell companies and new straw owners. (*Id.* ¶¶ 97– 99).

Wells Fargo knew that the shell companies and nominal owners weren't the true owners of these accounts. When Apex applied for merchant processing services with Wells Fargo for two shell companies, Wells Fargo noticed that one company's accounts listed Barnett as owner, but its

---

[2] The Complaint's non-conclusory allegations specific to Tarr are very limited and include broad assertions that Tarr was engaged in conduct similar to that of the other Enterprises and that Wells Fargo provided Tarr with similar services. (*See* Compl. ¶¶ 207–14). Because these allegations, if taken as true, wouldn't affect the Court's conclusion that the Complaint fails to state any claims, the question of whether these allegations are well-pleaded isn't relevant. For the purposes of this order only, the Court will credit those allegations and treat Tarr as being situated similarly to the other Enterprises.

application listed different owners. (*Id.* ¶¶ 126, 128). Apex addressed this issue not by fixing the application, but by directing Wells Fargo to change the ownership of the account without Barnett's involvement. (*Id.* ¶ 127). When that couldn't be done easily, Apex instead applied on behalf of another pair of shell companies with the same address, purportedly owned by Apex's CFO. (*Id.* ¶¶ 128, 133). Apex had told Wells Fargo only days before that such accounts should remain under Peikos's control. (*Id.* ¶ 122). Wells Fargo ultimately rejected the application for merchant processing services, explaining that its decision was a result of Apex's "high-risk," "unqualified business model" selling supplements. (*Id.* ¶¶ 140–41).

Wells Fargo instead assisted Apex in securing those services elsewhere by providing reference letters. A year before Wells Fargo declined to offer its own merchant processing services, Barnett requested that the Bank remove his name from a set of ten reference letters for various shell companies, hiding Barnett's association with those companies. (*Id.* ¶ 101). Wells Fargo complied. (*Id.*) And Wells Fargo continued supplying these anonymized letters even after determining that the Apex shell companies weren't qualified for merchant processing services. (*See id.* ¶¶ 149, 152).

Wells Fargo knew that Triangle was using straw owners, too. Phillips requested that Wells Fargo list other individuals as "100% owners" of the accounts he opened. (*Id.* ¶ 159). But Phillips also asked that Wells Fargo give him immediate access to and full control of those accounts. (*Id.*). Wells Fargo complied. (*Id.*) And when Wells Fargo needed to collect information on account-owners, it sent Phillips pre-filled paperwork identifying *Phillips* as the owner of Triangle's shell companies' accounts, not those companies' purported owners. (*Id.* ¶ 182).

The Complaint's factual allegations regarding Tarr are much more limited. Tarr had a P.O. Box address and a young manager. (*Id.* ¶ 207). Tarr's

business was of a sort that "generally create[s] an unusually high volume of chargebacks," and that the FTC alleges that Tarr was "concern[ed]" about high chargeback levels. (*Id.* ¶ 208). The FTC alleges in a separate action that Tarr diverted funds from shell companies to other Tarr entities. (*Id.* ¶ 209). Online reviews and "television personality Dr. Oz" claimed that Tarr was a scam. (*Id.* ¶¶ 210–11).

Over the Relevant Period, Wells Fargo opened more than 150 accounts for shell companies and straw owners within the Apex and Triangle enterprises. (*Id.* ¶ 6). Millions of dollars passed through these accounts, funds that were transferred promptly to accounts belonging to Apex, Triangle, Tarr, or the Principals. (*Id.* ¶¶ 6, 85).

Plaintiffs allege that each of them was defrauded by one of the Enterprises. (*Id.* ¶¶ 38–43). Wells Fargo moves to dismiss the Complaint's four claims under Fed. R. Civ. P. 12(b)(6).

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss calls for a preliminary evaluation of a party's pleading and tests only whether the pleading provides "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal marks and citation omitted). The Court must make all reasonable inferences that can be made in the plaintiff's favor. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066 (9th Cir. 2013). Reasonable inferences are those with "plausible grounds"—the complaint's factual allegations must "raise a reasonable expectation that discovery will reveal evidence" supporting that inference. *Twombly*, 550 U.S. at 556.

On the other hand, if the necessary inferences are merely *possible* on the facts alleged, rather than plausible, the complaint fails to state a claim.

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully"). Competing inferences consistent with the alleged facts can undermine a claim's plausibility. But a movant has to offer more than just another version of events to carry its burden on a motion to dismiss.

Where a plaintiff's claims sound in fraud, though, the heightened standard of Rule 9(b) applies. *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1102 (9th Cir. 2003). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The knowledge required to support a fraud claim, though, "may be alleged generally," Fed. R. Civ. P. 9(b)—that is, the plaintiff must only meet the *Twombly* standard of pleading sufficient facts to support an inference of knowledge. *See United States v. Corinthian Colleges*, 655 F.3d 984, 997 (9th Cir. 2011) (affirming dismissal under Rule 9(b) where pleading did not "clearly allege sufficient facts to support an inference or render plausible that [the defendant] acted [with requisite knowledge]").

## DISCUSSION

### I. The Complaint Fails to Allege the Knowledge Necessary for the Plaintiffs' First Three Claims

Each of Plaintiffs' first three claims—aiding and abetting fraud, conspiracy to commit fraud, and violation of Cal. Penal Code § 496 through receipt of stolen property—require allegations that Wells Fargo had actual knowledge of the fraud against Plaintiffs. For aiding and abetting, the defendant must have "actual knowledge of the specific primary wrong [that it] substantially assisted." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006). For conspiracy, the defendant "must have actual knowledge that a tort is planned and concur in the scheme with knowledge of its unlawful purpose." *Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1292 (2015). And for

violations of Cal. Penal Code § 496 involving receipt of stolen funds, the defendant must know that the funds are stolen—it's not enough to allege or prove that the defendant knew "that the legality of the [challenged] transaction was doubtful." *County of Los Angeles v. Civil Service Com.*, 39 Cal. App. 4th 620, 633 (1995).

A claimant doesn't need to make direct factual allegations of a defendant's knowledge to survive a motion to dismiss. At trial, "actual knowledge can be inferred from . . . circumstances . . . such that the defendant 'must have known.'" *RSB Vineyards, LLC v. ORSI,* 15 Cal. App. 5th 1089, 1097–98 (2017). It follows that a plaintiff can state a claim by alleging circumstantial facts that, if proven, would support the same inference. But allegations supporting only the inference that the defendant "should have known" aren't enough. *See id.* at 1098.

The Complaint doesn't meet this standard. Plaintiffs point to the allegation that "Wells Fargo bankers were aware of the Enterprises' risk-free trial schemes," (Dkt. 15 at 10), but this conclusory allegation isn't supported by any factual allegations. The paragraphs of the Complaint they rely on aver that Wells Fargo knew that: the Enterprises were opening shell corporations with straw owners; the accounts had high chargeback rates and would eventually be closed in favor of new accounts belonging to new shell corporations and new straw owners; the Enterprises were in an industry that posed a high risk of loss to merchant processing services; and the shell corporations' assets would be emptied into accounts belonging to the Principals, Apex, Triangle, or Tarr. (*See id.*). These allegations establish an inference that Wells Fargo knew that the Enterprises were defrauding *merchant processing services*, but they can't establish a similar inference as to the Enterprises actions toward their customers.

Plaintiffs place particular importance on the allegation that Wells Fargo

deemed Apex to have an "unqualified business model" for the Bank's merchant processing services because it was selling supplements. (*See* Compl. ¶ 154). But this allegation is too vague to draw the inference that, as Plaintiffs urge, Apex was "unqualified" because their industry was "rife with consumer deception" with "the potential for high chargebacks and losses for Wells Fargo caused by fraudulent activity." (Compl. ¶ 154). Wells Fargo's knowledge that Apex operated in an industry with the *potential* for fraudulent activity toward customers isn't the same as knowledge that Apex itself must have been defrauding its customers. And even knowledge of high chargeback rates can't support the inference that Wells Fargo must have known of Apex's consumer fraud. As the Complaint alleges, chargebacks can be initiated for reasons other than fraud, (*id.* ¶ 69), and so are a sign only of "*potential* illicit activity." (Compl. ¶ 68). The Court can't find, on such equivocal allegations, that Wells Fargo "must have known" that the Enterprises were defrauding consumers. *RSB Vineyards*, 15 Cal. App. 5th At 1097–98.

Without that knowledge, Wells Fargo can't have known of the specific primary wrong it allegedly aiding and abetting, *First Alliance*, 471 F.3d at 993, it can't have known that the Enterprises planned to defraud Plaintiffs and concurred in that scheme as necessary for conspiracy, *Navarrete*, 237 Cal. App. 4th at 1292, and it can't have known that the funds deposited into the Enterprises' accounts were stolen under Cal. Penal Code § 496. *County of Los Angeles v. Civil Service Com.*, 39 Cal. App. 4th at 633. The Complaint fails to state each of these claims as a result, so they are **DISMISSED WITHOUT PREJUDICE**.

    **II.**    **The Complaint Fails to State a Claim under California's Unfair Competition Law**

Plaintiffs' final claim seeks relief under California's Unfair Competition Law ("UCL"). That statute prohibits "unlawful, unfair or fraudulent business

act[s] [and] practices." Cal. Bus. & Prof. Code § 17200. The Complaint alleges that Wells Fargo is liable only because of its "substantial assistance in . . . unlawful business acts and practices" including "*inter alia*, aiding and abetting fraud, conspiring to commit fraud, and violating California Penal Code § 496." (Compl. ¶¶ 272–73). This assistance, Plaintiffs allege, amounts to "aid[ing] and abet[ting]" a UCL violation. (*Id.* ¶ 274).

UCL liability under such a theory requires allegations that Wells Fargo "kn[ew] [the Enterprises'] conduct constitute[d] a breach." *People v. Sarpas*, 225 Cal. App. 4th 1539, 1563 (2014). And as discussed above, the Complaint fails to allege that Wells Fargo knew the Enterprises were engaged in any misconduct toward Plaintiffs. Because Plaintiffs haven't alleged that knowledge, their UCL claim is **DISMISSED WITHOUT PREJUDICE**.

## CONCLUSION

Wells Fargo's Motion to Dismiss is **GRANTED**. The Complaint is **DISMISSED WITHOUT PREJUDICE**. Plaintiffs may amend their pleading without further leave within 21 days of this Order.

Wells Fargo's Motion to Strike seeks to strike allegations from a now-dismissed pleading, so that Motion is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Dated: March 30, 2022

*Larry A. Burns*

**HON. LARRY ALAN BURNS**
United States District Judge