1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN MCCRANER, SHARON STIANSEN, JANET POLLARD, MICHAEL DARLINGTON, SUSAN R. LANDREAU, JOHN N. TUFFIELD, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO & COMPANY, a corporation, WELLS FARGO BANK, N.A., a national banking association, <br><br> Defendants. | Case No.: 21-cv-1246-LAB-WVG <br><br> **ORDER:** <br><br> **1) DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT, [Dkt. 26];** <br><br> **2) DENYING MOTION TO STRIKE CLASS ALLEGATIONS, [Dkt. 28]; and** <br><br> **3) GRANTING REQUEST FOR JUDICIAL NOTICE, [Dkt. 29]** |

Plaintiffs John McCraner, Sharon Stiansen, Janet Pollard, Michael Darlington, Susan R. Landreau, and John N. Tuffield (collectively, "Plaintiffs") filed this putative class action against Defendants Wells Fargo & Company and Wells Fargo, N.A. (collectively, "Wells Fargo") for providing banking services to three separate fraudulent marketing schemes. Phillip Peikos, David Barnett, Brian Phillips, Richard Fowler, Ryan Fowler, and Nathan Martinez (collectively, the "Principals") operated three online subscription scams through their companies

Apex Capital Group, LLC ("Apex"), controlled by Peikos and Barnett, Triangle Media Corporation ("Triangle"), controlled by Phillips, and Tarr Inc. ("Tarr," and, together with Apex and Triangle, the "Enterprises"), controlled by the Fowlers and Martinez. Each of the Enterprises relied on banking services from Wells Fargo to effect its fraudulent scheme.

Plaintiffs assert four claims against Wells Fargo: aiding and abetting fraud; conspiracy to commit fraud; violation of California Penal Code § 496; and violation of California's Unfair Competition Law ("UCL"). Wells Fargo moves to dismiss each claim, (Dkt. 26), and to strike Plaintiffs' class allegations, (Dkt. 28). Having reviewed the parties' filings and the relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss, and **DENIES** the motion to strike.

## I.   BACKGROUND

Wells Fargo provided the Enterprises with banking services between 2009 and 2018.[1] (Dkt. 23, First Amended Complaint ("FAC") ¶¶ 8, 153, 165, 169–70, 201). Each Enterprise operated online "free trial" scams, promising customers risk-free trials while actually signing them up for expensive subscriptions that would automatically charge their accounts at regular intervals unless affirmatively cancelled. (*Id.* ¶ 2). To run these scams, the Enterprises relied on merchant processing services to charge customers' credit cards. (*Id.* ¶ 3). But the nature of the schemes made continued access to legitimate banking services difficult: as customers challenged the Enterprises' charges at higher than average rates, merchant processors would be unwilling to work with them. (*Id.* ¶¶ 69–72).

To conceal their fraudulent activities, the Enterprises created numerous

---

[1] The FAC's non-conclusory allegations specific to Tarr are limited and include broad assertions that Tarr was engaged in conduct similar to that of the other Enterprises and that Wells Fargo provided Tarr with similar services. (*See* FAC ¶¶ 207–14). For the purposes of this order only, the Court will credit those allegations and treat Tarr as being situated similarly to Apex and Triangle.

shell companies and opened merchant accounts in these companies' names. (*Id.* ¶ 71). The Enterprises routed transactions through these shell accounts and cycled funds between accounts if one was shut down, a scheme known as "credit card laundering." (*See, e.g., id.* ¶¶71–73). To ensure continued access to merchant processing services, the Principals hid their personal involvement with the shell companies by recruiting straw owners. (*Id.* ¶¶ 77, 84, 106, 121–22, 157). Wells Fargo complied with the Enterprises' requests that that the Principals retain control over the accounts even though they weren't listed as the account owners. (*Id.* ¶¶ 125, 159).

During Wells Fargo's extended relationship with the Enterprises, it received signals that the Enterprises were engaging in misconduct. Monthly account statements reflected chargeback rates much higher than the industry standard. (*Id.* ¶¶ 98, 111–13, 192, 228). And when certain Apex-affiliated accounts lost merchant processing services due to high chargeback rates, Apex closed them and opened new ones with new shell companies and new straw owners. (*Id.* ¶¶ 97–99).

Wells Fargo knew that the shell companies and straw owners weren't the true account owners. (*Id.* ¶ 81). When Apex applied for merchant processing services with Wells Fargo for two shell companies, Wells Fargo noticed that one company's accounts listed Barnett as owner, but its application listed different owners. (*Id.* ¶¶ 126, 128). Apex directed Wells Fargo to change the ownership of the account without Barnett's involvement. (*Id.* ¶ 127). When that change wasn't possible, Apex instead applied on behalf of another pair of shell companies with the same address, purportedly owned by Apex's CFO. (*Id.* ¶¶ 128, 133). Apex had told Wells Fargo only days before that such accounts should remain under Peikos's control. (*Id.* ¶ 122). Wells Fargo ultimately rejected the application for merchant processing services, explaining Apex's "high-risk" business selling supplements was an "unqualified business model." (*Id.* ¶¶ 140–41).

After declining to offer Apex merchant processing services, Wells Fargo helped Apex secure those services elsewhere by providing reference letters. A year before rejecting Apex's application, Wells Fargo removed Barnett's name from ten reference letters for various shell companies at his request, concealing Barnett and Apex's association with the shells. (*Id.* ¶ 101). Wells Fargo continued supplying anonymized reference letters even after it determined that the Apex shell companies weren't qualified for Wells Fargo's own merchant processing services. (*See id.* ¶¶ 149, 152).

Wells Fargo also knew that Triangle was using straw owners. Wells Fargo granted Phillips's request that other individuals be listed as "100% owners" of the accounts he opened, but also gave him immediate access to and full control of the accounts. (*Id.* ¶ 159). Wells Fargo also sent Phillips pre-filled paperwork identifying him as the owner of Triangle-affiliated shell companies' accounts, instead of those companies' purported owners. (*Id.* ¶ 182).

The FAC's factual allegations regarding Tarr are more limited. Tarr had a P.O. Box address and a young manager, (*Id.* ¶ 207), and was engaged in a business that generated "an unusually high volume of chargebacks," (*id.* ¶ 208). In a separate action, the FTC alleges that Tarr diverted funds from shell companies to other Tarr entities. (*Id.* ¶ 209). Online reviews and "television personality Dr. Oz" claimed that Tarr was a scam. (*Id.* ¶¶ 210–11).

During the relevant period, Wells Fargo opened more than 150 accounts for shell companies and straw owners associated with Apex and Triangle. (*Id.* ¶ 6). Millions of dollars passed through these accounts, and these funds were transferred to accounts belonging to Apex, Triangle, Tarr, or the Principals. (*Id.* ¶¶ 6, 85).

In 2017 and 2018, the Federal Trade Commission ("FTC") brought separate actions against each of the Enterprises. (*Id.* ¶¶ 17–18, 23, 28); *FTC v. Apex Cap. Grp. LLC* (*FTC v. Apex*), No. 18-cv-9573-JFW-JPR (C.D. Cal.); *FTC v. Triangle*

*Media Corp.* (*FTC v. Triangle*), No. 18-cv-1388-LAB-WVG (S.D. Cal.); *FTC v. Tarr Inc.*, No. 17-cv-2024-LAB-KSC (S.D. Cal.). Subsequently, Thomas W. McNamara (the "Receiver") was appointed as receiver for Apex and Triangle. (FAC ¶¶ 18, 23); *FTC v. Apex*, ECF Nos. 40–41; *FTC v. Triangle*, ECF No. 11. As relevant here, the Receiver received court approval to bring claims against Wells Fargo stemming from the Triangle Receivership, *FTC v. Triangle*, ECF No. 142, and filed a companion case against Wells Fargo in this Court the same day this action was filed, *McNamara v. Wells Fargo & Co.*, No. 21-cv-1245-LAB-DDL (S.D. Cal. July 8, 2021), ECF No. 1. Plaintiffs here share counsel with the Receiver. (FAC ¶ 5).

Plaintiffs filed their original Complaint on July 8, 2021, alleging that each of them was defrauded by one of the Enterprises. (Dkt. 1). The Court dismissed the Complaint for failing to allege facts sufficient to demonstrate that Wells Fargo had actual knowledge the Enterprises were defrauding consumers. (Dkt. 22). Plaintiffs subsequently filed the FAC, which added new allegations in an attempt to remedy the shortcomings in the original Complaint. (*See* FAC ¶¶ 215–42). Wells Fargo now moves to dismiss the FAC's four claims, (Dkt. 26), and to strike the FAC's class allegations, (Dkt. 27).

## II.   RULE 12(b)(6) MOTION TO DISMISS

### A.   Legal Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is plausible if the factual allegations supporting it permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations need not be detailed; instead, the plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level."

*Twombly*, 550 U.S. at 545. The plausibility standard isn't a "'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). Courts aren't required to accept legal conclusions couched as factual allegations and "formulaic recitation[s] of the elements of a cause of action" aren't sufficient. *Twombly*, 550 U.S. at 555. The Court accepts as true all facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). Ultimately, a court must determine whether the plaintiff's alleged facts, if proven, permit the court to grant the requested relief. *See Iqbal*, 556 U.S. at 666; Fed. R. Civ. P. 8(a)(2).

Where a plaintiff's claims sound in fraud, Rule 9(b)'s heightened standard applies. *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1102 (9th Cir. 2003). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Vess*, 317 F.3d at 1106 (holding allegations of fraud must identify "the who, what, when, where, and how of the misconduct charged") (internal quotation marks and citation omitted). The knowledge required to support a fraud claim, however, "may be alleged generally, " Fed. R. Civ. P. 9(b), so the plaintiff must plead only sufficient facts to plausibly support an inference of knowledge, *see United States v. Corinthian Colls.*, 655 F.3d 984, 997 (9th Cir. 2011) (affirming dismissal under Rule 9(b) where pleading didn't "clearly allege sufficient facts to support an inference or render plausible that [the defendant] acted [with requisite knowledge]").

## B.  Statute of Limitations

Wells Fargo first argues Plaintiffs' claims should be dismissed because they are time barred. (Dkt. 26-1 at 6–8). The statute of limitations for claims for conspiracy to commit fraud and aiding and abetting fraud is three years. Cal. Civ. Proc. Code § 338(d) (three-year statute of limitations for "[a]n action for relief on

the ground of fraud"); *Aaroe v. First Am. Title Ins. Co.*, 222 Cal. App. 3d 124, 128 (1990) (recognizing § 338(d) governs fraud claims and applying § 338(d) to conspiracy to defraud claims). Similarly, the statute of limitations for a claim for violation of California Penal Code § 496 is three years. Cal. Civ. Proc. Code § 338(c), (d); *Evans v. ZB, N.A.*, 17-cv-1123 WBS DB, 2019 WL 6918278, at *6 (E.D. Cal. Dec. 19, 2019). And the limitations period for a UCL claim is four years. Cal. Bus. & Prof. Code § 17208. Under California law, a cause of action accrues, and the statute of limitations begins to run, "when the cause of action is complete with all of its elements." *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999).

The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) (internal citation omitted). "In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.'" *Id.* at 808 (emphasis in original) (quoting *McKelvey v. Boeing N. Am., Inc.*, 74 Cal. App. 4th 151, 160 (1999)).

The FAC alleges that Plaintiffs first learned of Wells Fargo's alleged conduct in June 2019 and July 2019 when the Receiver obtained discovery materials from Wells Fargo in response to a subpoena. (FAC ¶ 269). The FAC further alleges that "[d]espite diligent investigation of the circumstances of the injury, . . . it was not reasonably possible for the Plaintiffs to obtain facts relating to Wells Fargo's participation in the frauds" prior to the production of the discovery materials. (*Id.*). Once Plaintiffs' counsel received the production materials in his role as counsel for the Receiver, he was able to establish the alleged conspiracy, Wells Fargo's alleged knowledge of the Enterprises' frauds, and Wells Fargo's alleged assistance. (*Id.*). The Courts finds the FAC sufficiently pleads specific facts

showing "(1) the time and manner of [Plaintiffs'] discovery and (2) [their] inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808, *see also Evans*, 2019 WL 6918278, at *6 (holding that the discovery rule tolled the statute of limitations when the plaintiffs didn't learn of the defendant bank's knowledge of the fraud until a bankruptcy trustee filed a complaint detailing the bank's relationship with the fraudulent enterprise, including its use of "atypical banking procedures").

The allegations in the FAC indicate that the earliest date Plaintiffs could have learned of Wells Fargo's alleged misconduct was after the first document production in June 2019. (FAC ¶ 269). Assuming, for the purpose of this Order only, that these materials were produced on June 1, 2019, the limitations period for Plaintiffs' claims expired on June 1, 2022—three years later. The original Complaint was filed on July 8, 2021, (Dkt. 1), within the limitations period.

Plaintiffs' claims are timely. Wells Fargo's motion to dismiss the FAC's claims as time barred is **DENIED**.

## C.   Aiding and Abetting

The FAC's first claim alleges Wells Fargo aided and abetted the Enterprises' frauds. (FAC ¶¶ 281–86). To state a claim for aiding and abetting, the FAC must allege that Wells Fargo: (1) actually knew the Enterprises were defrauding consumers; and (2) provided substantial assistance in that fraud. *See In re First All. Mortg. Co.*, 471 F.3d 977, 992–93 (9th Cir. 2006) (quoting *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005)). Wells Fargo contends the FAC doesn't allege sufficient facts to support an inference that Wells Fargo actually knew about the Enterprises' fraud, (Dkt. 26-1 at 9–13), or that Wells Fargo provided substantial assistance to the fraud, (*id.* at 13–15).

### 1.   Actual Knowledge

A complaint doesn't need to directly allege a defendant's knowledge to survive a motion to dismiss. At trial, "actual knowledge can be inferred from . . .

circumstances . . . such that the defendant 'must have known.'" *RSB Vineyards, LLC v. ORSI*, 15 Cal. App. 5th 1089, 1097–98 (2017). Similarly, a plaintiff states a claim sufficient to survive a motion to dismiss by alleging circumstantial facts that, if proven, support the same inference. *See Corinthian Colls.*, 655 F.3d at 997. But allegations that only support an inference that the defendant "should have known" aren't enough. *See RSB Vineyards*, 15 Cal. App. 5th at 1098.

The FAC, like the original Complaint, alleges that "Wells Fargo bankers were aware of the [Enterprises'] risk-free trial schemes, understood the people listed as 'owners' of the Wells Fargo accounts did not actually own or control them, and knew the [Enterprises] were engaged in credit card laundering." (FAC ¶ 6). For the first time, the FAC alleges that "Wells Fargo knew that the Enterprises were defrauding not only merchant processing services, but also the Enterprises' own consumer customers." (*Id.* ¶ 215). Plaintiffs allege Wells Fargo knew that the Enterprises were opening accounts for shell companies with straw owners, (*id.* ¶¶ 91–94); these accounts had high chargeback rates and other "indicia of fraud" and would eventually be closed in favor of new accounts belonging to new shell companies with new straw owners, (*id.* ¶¶ 86, 88, 97, 99, 101–06, 122, 125–36, 151, 154–82); the Enterprises were engaged in businesses that posed a high risk of loss to merchant processing services, (*id.* ¶¶ 141, 183–90); and the shell companies' assets were transferred in round number amounts (*e.g.*, $100,000) to accounts belonging to the Principals or Enterprises, (*id.* ¶¶ 195–96, 209, 255). In its Order dismissing the original Complaint, the Court found that "[t]hese allegations establish an inference that Wells Fargo knew that the Enterprises were defrauding *merchant processing services*, but they can't establish a similar inference as to the Enterprises actions toward their customers." (Dkt. 22 at 7 (emphasis in original)).

The FAC also realleges that Wells Fargo rejected Apex's application for merchant processing services because Apex had an "unqualified business model"

because it was selling supplements. (*See* FAC ¶ 140–41). In dismissing the Complaint, the Court found that allegation "too vague to draw the inference that . . . Apex was 'unqualified' because their industry was 'rife with consumer deception' with 'the potential for high chargebacks and losses for Wells Fargo caused by fraudulent activity.'" (Dkt. 22 at 8 (quoting Dkt. 1, Compl. ¶ 141)). The Court also found that "Wells Fargo's knowledge that Apex operated in an industry with the potential for fraudulent activity toward customers isn't the same as knowledge that Apex itself must have been defrauding its customers." (*Id.*).

The FAC adds new allegations that Plaintiffs assert are sufficient to support an inference that Wells Fargo must have known the Enterprises were defrauding their customers. Specifically, the FAC alleges Wells Fargo knew that the Enterprises employed "extremely troubling direct-to-consumer sales tactics, including negative option sales, free trial offers, and automatic periodic billing," (FAC ¶¶ 217–28); and the Enterprises' accounts generated an unusually high number of chargeback requests, (*id.* ¶¶ 230–42).

The FAC includes specific factual allegations demonstrating that Wells Fargo actually knew that the Enterprises were utilizing deceptive sales tactics and recurring billing. (*See, e.g.*, FAC ¶ 219 (email to Phillips stating "we need to close [a Triangle-affiliated] account as Wells stated it was a prohibited business type (*negative option followed by a free or low cost trial*)"); ¶ 220 (email from Phillips to a Wells Fargo banker stating "we specialize in high risk *continuity* business. I'm pretty sure Wells doesn't provide processing for those business types."); ¶ 228 (emails between Apex personnel discussing Wells Fargo's revocation of an Apex-affiliated merchant processing account because Well Fargo "found the *recurring billing model* too risky") (emphasis added to all)). These newly pleaded facts are sufficient to plausibly allege that Wells Fargo had actual knowledge that the Enterprises were engaging in fraudulent sales practices. *Compare In re First All.*, 471 F.3d at 993 (holding a jury could reasonably find that the defendant bank

had actual knowledge of the fraud when it received reports detailing the fraudulent practices its client was engaged in), *with Paskenta Band of Nomlaki Indians v. Umpqua Bank*, 846 F. App'x 589, 590 (9th Cir. 2021) (holding allegations the defendant bank knew of "various irregularities" were insufficient to establish actual knowledge), *and Diaz v. Intuit, Inc.*, No. 15-cv-1778-EJD, 2018 WL 2215790, at *6 (N.D. Cal. May 15, 2018) ("Although Plaintiffs' allegations may support an inference that Intuit was suspicious of potential fraud or knew that there was a risk of fraud, the allegations are insufficient to show that Intuit had 'actual knowledge' of fraud.").

As for the new allegations regarding chargebacks, the FAC alleges that because of the number of chargebacks generated by the Enterprises, Wells Fargo must have known that "at least some portion of consumers were being defrauded by the Enterprises." (FAC ¶ 229). In support of this conclusory allegation, Plaintiffs allege Wells Fargo placed a hold on the account of an Apex-affiliated LLC due to a high volume of chargebacks. (*Id.* ¶ 232). The FAC includes communications stemming from that hold which highlight the number of chargebacks that Wells Fargo, as a credit card issuer, was processing from the LLC's account. (*Id.* ¶¶ 233–38). The most common reasons consumers requested chargebacks were: "fraudulent transaction," "unauthorized transactions," "cancelled recurring" transaction, and "refund not processed."[2] (*Id.* ¶¶ 235–36). As the FAC notes, "a high level of chargeback rates in a high-risk industry known to be rife with fraud did not put Wells Fargo on notice of the consumer fraud in and of itself." (*Id.* ¶ 239). Thus, knowledge of high chargeback rates can't, of itself, support the inference that Wells Fargo must have known of the Enterprises' consumer fraud.

However, the FAC's allegations about Wells Fargo's knowledge of the

---

[2] When a credit card issuing bank initiates a chargeback on behalf of a consumer, it assigns a standardized "reason code" to the request which identifies the reason the consumer disputes a charge. (FAC ¶ 235).

chargeback rates and the Enterprises' sales tactics, together with the allegations made in the original Complaint, support an inference that Wells Fargo "must have known" that the Enterprises were defrauding consumers. *RSB Vineyards*, 15 Cal. App. 5th at 1097–98. The Court finds the FAC sufficiently alleges Wells Fargo's knew the Enterprises were defrauding consumers.

### 2.      Substantial Assistance

"'[O]rdinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort." *See In re First All.*, 471 F.3d at 995 (quoting *Casey*, 127 Cal. App. 4th at 1145). However, when a bank "utilize[s] atypical banking procedures to service [a bad actor's] accounts," it "rais[es] an inference that [the bank] knew of the [fraudulent] scheme and sought to accommodate it by altering [its] normal ways of doing business." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1120 (C.D. Cal. 2003).

Here, the FAC includes numerous allegations that Wells Fargo used atypical banking procedures to accommodate the Enterprises that the Court finds sufficiently plead the substantial assistance element of Plaintiffs' aiding and abetting claim. For example, Wells Fargo helped Apex-affiliated shell companies secure merchant processing services from other banks by providing reference letters with Barnett's name removed, concealing Barnett and Apex's association with the shells. (FAC ¶ 101). Wells Fargo continued supplying reference letters even after determining that Apex shell companies weren't qualified for Wells Fargo's own merchant processing services. (*See id.* ¶¶ 149, 152). Additionally, Wells Fargo gave Phillips immediate access to and full control of Triangle-affiliated accounts, even though the accounts listed known straw owners—not Phillips—as "100% owners." (*Id.* ¶ 159; *see also, e.g., id.* ¶¶ 101–08, 126, 145–47, 168, 171, 180–81 (additional allegations describing atypical banking

procedures)). The Court finds the FAC sufficiently alleges that Wells Fargo provided substantial assistance to the fraud.

*   *   *

The FAC makes sufficient factual allegations to plausibly state an aiding and abetting claim. Wells Fargo's motion to dismiss that claim is **DENIED**.

### D.    Conspiracy

The FAC's second claim alleges Wells Fargo entered into a conspiracy with the Principals to commit fraud. (*id.* ¶¶ 287–90). Wells Fargo contends the FAC doesn't allege sufficient facts to demonstrate any agreement between Wells Fargo and the Enterprises. (Dkt. 26-1 at 15–16).

To state a plausible claim for civil conspiracy, a plaintiff must allege sufficient facts to support an inference that "two or more persons . . . agreed to a common plan or design to commit a tortious act." *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995). While an agreement must be pled with particularity where the object of the conspiracy was fraud, *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 990–91 (9th Cir. 2006) (citing *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1521 (N.D. Cal. 1990)), that agreement "may be tacit as well as express. A conspirator's concurrence in the scheme may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1292 (2015).

In the companion case brought by the Receiver, the Court found the complaint sufficiently plead a specific tacit agreement when it alleged that Wells Fargo: (1) "knew that the Principals intended to engage in fraud by cycling through shell companies and bank accounts with straw owners"; (2) "had an interest in the scheme, as it had implemented policies designed to encourage employees to open more accounts"; and (3) "engaged in unorthodox practices to further the fraud while coaching the Principals through their end of it." *McNamara v. Wells*

*Fargo & Co.*, No. 21-cv-1245-LAB-DDL, slip op. at 17–18 (S.D. Cal. Mar. 30, 2022), ECF No. 20. By comparison, Plaintiffs here allege that Wells Fargo knew the Enterprises cycled through shell companies and straw owners, (*see, e.g.*, FAC ¶¶ 71–73, 81, 125–28, 159); had an interest in opening new accounts due to a high pressure sales culture, (*id.* ¶¶ 8–10), and used atypical banking procedures to accommodate the Enterprises' fraud, including coaching the Principals, (*id* ¶¶ 101, 149, 152, 159).

The FAC's allegations are sufficient to allege Wells Fargo's knowledge of and concurrence in the Enterprises' schemes. Wells Fargo's motion to dismiss Plaintiff's civil conspiracy claim is **DENIED**.

### E.   California Penal Code § 496

The FAC's third claim alleges Wells Fargo received stolen property from the Enterprises in violation of California Penal Code § 496. (*Id.* ¶¶ 291–297). Wells Fargo contends the FAC doesn't state a claim under § 496 because the case doesn't involve "stolen" property within the meaning of the statute, (Dkt. 26-1 at 17–18), and the FAC fails to allege that Wells Fargo actually knew it received stolen property, (*id.* at 18–19).

California Penal Code § 496 defines the criminal offense commonly referred to as receiving stolen property. *Switzer v. Wood*, 35 Cal. App. 5th 116, 125–26 (2019); Cal. Penal Code § 496(a). The statute also provides that a plaintiff may recover treble damages from any person who knowingly receives stolen property. § 496(c). Treble damages are available even when the defendant *hasn't* been criminally convicted under the statute. *Switzer*, 35 Cal. App. 5th at 126 (citing *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1045–1047 (2013)). To establish a violation, a plaintiff must show: "(i) property was stolen or obtained in a manner constituting theft, (ii) the defendant knew the property was so stolen or obtained, and (iii) the defendant received or had possession of the stolen property." *Id.* (citing *Lacagnina v. Comprehend Sys., Inc.*, 25 Cal. App. 5th 955, 970 (2018)). Money obtained

through false representations or fraud can constitute theft within the meaning of § 496. *See, e.g.*, *id.* at 126–30 (holding money obtained by fraud can constitute theft within the meaning of § 496); *Bell*, 212 Cal. App. 4th at 1048 (holding theft by false pretenses constituted a violation of § 496); *see also Siry Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 361–62 (2022) (noting that to prove money obtained by fraud to constitute a theft, "a plaintiff must establish criminal intent on the part of the defendant beyond 'mere proof of nonperformance or actual falsity'" (citation omitted));[3] *Switzer*, 35 Cal. App. 5th at 126 ("[W]hether a wrongdoer's conduct in any manner constituted a 'theft' is elucidated by other provisions of the Penal Code defining theft, such as Penal Code § 484."); Cal. Penal Code § 484(a) ("Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money . . . is guilty of theft.").

Here, the FAC alleges that the money Wells Fargo received from the Enterprises was obtained through fraud and false pretenses, (FAC ¶ 294), which is sufficient to allege a theft within the meaning of Penal Code § 496. Because the Court has also determined that the FAC sufficiently alleges that Wells Fargo knew the Enterprises were defrauding consumers, (*see, e.g.*, *id.* ¶¶ 68–69, 74–81, 83, 97–100, 105, 110–15, 141–44, 160, 184, 192, 218–28, 230–42, 256–61), the FAC

---

[3] Wells Fargo's motion to dismiss and reply in support of its motion cite *Siry Investment, L.P. v. Farkhondehpour*, 45 Cal. App. 5th 1098 (2020), a case which was recently reversed in part by the California Supreme Court. *See Siry*, 13 Cal. 5th 333 (2022). The Supreme Court issued its opinion on July 21, 2022, *see id.*, and Wells Fargo filed its reply on August 1, 2022, (Dkt. 33). The reply cited the Court of Appeal's opinion in *Siry*, but didn't inform the Court of the Supreme Court's decision on July 21. Further, when responding to Plaintiffs' statement of recent authority identifying the Supreme Court's decision in *Siry*, (Dkt. 37), Wells Fargo omitted relevant and, arguably, adverse language when quoting the opinion, (Dkt. 39 at 2). Counsel is reminded the duty of candor toward the tribunal requires the disclosure of adverse, controlling legal authority to the Court.

plausibly states a claim for receiving stolen property in violation of California Penal Code § 496. Wells Fargo's motion to dismiss that claim is **DENIED**.

### F.   UCL

The FAC's fourth claim alleges Wells Fargo violated the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq*, (FAC ¶¶ 298–304), and seeks "equitable relief in the form of full restitution," (*id.* ¶ 304). The UCL is a consumer protection statute that broadly prohibits "any unlawful, unfair or fraudulent business act or practice." § 17200. "Each of these three adjectives captures 'a separate and distinct theory of liability.'" *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009)). The FAC alleges that Wells Fargo is liable under the UCL because of its "substantial assistance in . . . unlawful business acts and practices" including "aiding and abetting fraud, conspiring to commit fraud, and violating California Penal Code § 496." (FAC ¶¶ 300, 303). This assistance, Plaintiffs allege, amounts to "aid[ing] and abet[ting]" a UCL violation. (*Id.* ¶ 304). In the alternative, Plaintiffs allege Wells Fargo is liable under the UCL for knowingly aiding and abetting the Enterprises' unlawful or unfair conduct. (*Id.* ¶¶ 301–02). Wells Fargo argues Plaintiffs' UCL claim should be dismissed for four reasons, including for failing to establish the inadequacy of legal remedies. (Dkt. 26-1 at 20–22).

A plaintiff may seek equitable relief only if she lacks an adequate legal remedy, such as money damages. *See Mort v. United States*, 86 F.3d 890, 892 (9th Cir. 1996) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)) ("It is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law." (ellipsis in original)); *see also, e.g.*, *Schroeder v. United States*, 569 F.3d 956, 963 (9th Cir. 2009) ("[E]quitable relief is not appropriate where an adequate remedy exists at law."). A plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL." *Sonner v. Premier*

*Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

Plaintiffs argue that the Court should permit them to plead a UCL claim in the alternative because this case is in a different procedural posture than *Sonner*. (Dkt. 30 at 23 (citing *Krause-Pettai v. Unilever U.S., Inc.*, No. 20-cv-1672-DMS-BLM, 2021 WL 1597931, at *4 (S.D. Cal. April 23, 2021); *Rothman v. Equinox Holdings, Inc.*, No. 20-cv-9760-CAS-MRWx, 2021 WL 1627490 at *12 (C.D. Cal. Apr. 27, 2021)). But *Sonner's* holding applies regardless of a case's procedural posture. *See Rivera v. Jeld-Wen, Inc.*, No. 21-cv-1816-AJB-AHG, 2022 WL 3702934, at *12 (S.D. Cal. Feb. 4, 2022) (collecting cases rejecting arguments distinguishing *Sonner* based on procedural posture); *see also Lisner v. Sparc Grp. LLC*, No. 21-cv-5713-AB (GJSx), 2021 WL 6284158, at *8 (C.D. Cal. Dec. 29, 2021) (collecting cases and holding that "Sonner's reasoning applies at the pleading stage"). And, under *Sonner*, "[t]he issue is not whether a pleading may seek distinct forms of relief in the alternative, but rather whether a prayer for equitable relief states a claim if the pleading does not demonstrate the inadequacy of a legal remedy. On that point, *Sonner* holds that it does not." *Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 907 (N.D. Cal. 2021) (citing *Sonner*, 971 F.3d at 844).

Here, the FAC pleads claims for equitable relief under the UCL but doesn't plead inadequate legal remedies. (*See* FAC ¶¶ 300–04). As Plaintiffs acknowledge, (*see* Dkt. 30 at 23 n.7), the Court dismissed the Receiver's UCL claim against Wells Fargo for failing to allege inadequate legal remedies. *See McNamara*, No. 21-cv-1245-LAB-DDL, slip op. at 17–18, ECF No. 20. The same result obtains here.

Wells Fargo's motion to dismiss the FAC's UCL claim is **GRANTED**. That claim is **DISMISSED WITHOUT PREJUDICE**.

//

//

## III.   RULE 12(b)(1) MOTION TO DISMISS

Wells Fargo moves to dismiss Plaintiffs John McCraner, Sharon Stiansen, and Janet Pollard for lack of Article III standing because they already received refunds of the amounts they paid in connection with the Enterprises' schemes. (Dkt. 26-1 at 24–25). A motion to dismiss for lack of standing is "properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("[S]tanding . . . pertain[s] to federal courts' subject matter jurisdiction."). Although the Wells Fargo doesn't invoke Rule 12(b)(1), the Court construes this argument as a motion to dismiss for lack of subject matter jurisdiction under that rule.

To have standing to bring a suit in federal court, a plaintiff must show: (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Wells Fargo challenges only injury in fact, arguing that McCraner, Stiansen, and Pollard lack standing because they can't show the requisite injury. (Dkt. 26-1 at 25). To establish injury in fact, a plaintiff must show she suffered "an invasion of a legally protected interest which is (a) concrete and particularized. . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal marks and citations omitted).

Here, McCraner, Stiansen, and Pollard each received full refunds of the amounts they paid in connection with the Enterprises' fraudulent schemes. (Dkt. 29, Ex. A ¶ 11; Ex. B ¶ 14; Ex. C ¶ 19).[4] Plaintiffs argue that McCraner,

---

[4]  The Court **GRANTS** Wells Fargo's request for judicial notice of the: (1) Declaration of John McCraner in *FTC v. Triangle*, ECF No. 5-1, (Dkt. 29, Ex. A); (2) Declaration of Sharon Stiansen in *FTC v. Apex*, ECF No. 2, (Dkt. 29, Ex. B); and (3) Declaration of Janet Pollard in *FTC v. Triangle*, ECF No. 5-1, (Dkt. 29, Ex. C). (Dkt. 29). Courts may "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Proper subjects for judicial notice include "undisputed matters of public

Stiansen, and Pollard have standing notwithstanding their refunds because they weren't compensated for the loss of the use of their money with interest. (Dkt. 30 at 6) Wells Fargo argues that any claimed interest is too *de minimis* to confer standing. (Dkt. 33 at 11). Binding Supreme Court and Ninth Circuit precedent clearly demonstrate Plaintiffs are correct.

"For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017); *see, e.g.*, *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008) (noting that the loss of "a dollar or two" is sufficient to confer standing); *Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020) (holding the loss of $3.76 in interest was sufficient to confer standing). And the Ninth Circuit has held that when a plaintiff "receive[s] a full refund, less interest, on the money she was wrongfully charged," the "temporary loss of use of one's money constitutes an injury in fact for purposes of Article III." *Van*, 962 F.3d at 1162, 1164.

McCraner, Stiansen, and Pollard each received full refunds, but didn't receive compensation for the loss of their money with a payment of interest. (Dkt. 29, Ex. A ¶ 11; Ex. B ¶ 14; Ex. C ¶ 19). The Court finds these Plaintiffs have suffered an injury in fact sufficient to confer Article III standing. Wells Fargo's motion to dismiss McCraner, Stiansen, and Pollard for lack of standing is **DENIED**.

## IV.   RULE 12(f) MOTION TO STRIKE

Wells Fargo separately moves to strike the FAC's class allegations, arguing that they don't sufficiently allege commonality, adequacy of representation, predominance, typicality, and superiority of class resolution. (Dkt. 28). Plaintiffs

---

record, . . . including documents on file in federal or state courts." *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (internal citations omitted). Plaintiffs oppose Wells Fargo's request for judicial notice, (*see* Dkt. 32), but don't dispute the declarations' accuracy. The Court finds the declarations to be proper subjects for judicial notice.

oppose Wells Fargo's motion, arguing it is premature at this time. (Dkt. 31 at 3–4).

Under Rule 12(f), the court may strike "any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). Class allegations can be stricken at the pleading stage. *See Guzman v. Bridgepoint Educ., Inc.*, No. 11-cv-69-WQH-WVG, 2013 WL 593431, at *7 (S.D. Cal. Feb. 13, 2013) (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). However, courts typically review class allegations through a motion for class certification. *See Silcox v. State Farm Mut. Auto. Ins. Co.*, No. 14-cv-2345-AJB-MDD, 2014 WL 7335741, at *8 (S.D. Cal. Dec. 22, 2014) (collecting cases). It is rare and generally disfavored to strike class allegations prior to discovery and a motion for class certification. *See, e.g.*, *Miholich v. Senior Life Ins. Co.*, No. 21-cv-1123-WQH-AGS, 2022 WL 410945, at *6 (S.D. Cal. Feb. 10, 2022); *Sousa v. 7-Eleven, Inc.*, No. 19-cv-2142-JLS-RBB, 2020 WL 6399595, at *4 (S.D. Cal. Nov. 2, 2020); *see also Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1245 (C.D. Cal. 2011) ("[I]t is in fact rare to [strike class allegations] in advance of a motion for class certification."); *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007) ("[T]he granting of motions to dismiss class allegations before discovery has commenced is rare.").

Here, Wells Fargo "has not filed an answer, the Court has not issued a scheduling order for discovery or class certification purposes, the Parties have not conducted any class-related discovery, and a motion for class certification is not presently before the Court." *Sousa*, 2020 WL 6399595, at *5. Given the early stage of the case, the Court finds that Wells Fargo's motion to strike is premature. *See, e.g.*, *id.* (denying motion to strike class allegations as premature); *see also Sutcliffe v. Wells Fargo Bank, N.A.*, No. C-11-06595 JCS, 2012 WL 4835325, at *4 (N.D. Cal. Oct. 9, 2012) ("[T]he district court has broad discretion as to *when* to address whether a class should be certified and the adequacy of a class

definition." (emphasis in original)). Wells Fargo's motion to strike is **DENIED**.

## V.     CONCLUSION

With the exception of Wells Fargo's motion to dismiss the FAC's UCL claim, which is **GRANTED**, the Court otherwise **DENIES** Wells Fargo's motion to dismiss and **DENIES** Wells Fargo's motion to strike. Wells Fargo must file an Answer to the FAC by **April 13, 2023**.

**IT IS SO ORDERED.**

Dated:  March 30, 2023

**Hon. Larry Alan Burns**
United States District Judge

21-cv-1246-LAB-WVG